# Richmond

JAMES HILLIARD, ALLEN MONTAGUE AND J. H. SACRA,
ADM'R, ETC. V. BOARD OF SUPERVISORS OF
SPOTSYLVANIA COUNTY.

March 10, 1938.

Present, Campbell, C. J., and Holt, Hudgins, Gregory, Eggleston
and Spratley, JJ.

The opinion states the case.

*Allen & Allen* and *Edwin M. Young,* for the plaintiffs in error.

*W. J. Gibson, F. M. Chichester* and *E. R. Carner,* for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

On the night of Tuesday, April 2, 1935, Mr. and Mrs. J. T. Coleman were brutally murdered on their farm in a rural section of Spotsylvania county, by some person or persons then unknown. Upon the discovery of their bodies the following day, the whole county was greatly aroused. The board of supervisors of the county on April 3rd, offered a reward in the following language:

"It appearing to this board that on the night of April 2, 1935, J. T. Coleman and wife were murdered by some unknown person, or persons, and as yet no arrest has been made, it is, therefore, ordered by this board that a reward of $500.00 be paid to any person, or persons, arresting or giving information leading to the arrest and conviction of the guilty party or parties."

The State offered an additional reward of $200, to be paid to the party or parties, earning the reward offered by the county.

The sheriff of the county, M. L. Blaydes, a constable of the county, S. W. Burgess, and the county game warden, Blake Lewis, started immediately an especially active and vigorous investigation and search for the murderers. They asked the assistance of the police authorities of the surrounding counties and the near-by cities. They followed every clue or lead suggested in connection with the investigation, visited many places and questioned many persons for information.

The three officers early suspected a negro, Joe Jackson, as a guilty person. His name had been brought into their investigation by reason of some report or rumor, the source of which is not disclosed in the record. Jackson bore the general reputation of a bad character in the community, and had a prison record. It was said that he had shot a man, whose house was believed to have been burned down by Jackson the night after the shooting.

On April 4th, the county officers went to the home of the brother of Joe Jackson, in an effort to find the latter, or to secure information where he could be found. They then learned that Jackson had, on a former occasion, worked for the murdered couple. They also learned that Jackson had been living in Fredericksburg. With the information they had secured, and with suspicion strongly fixed in their minds, a search was made of the home where Jackson had lived in the county and of all his former haunts. The police in the city of Fredericksburg were especially notified to be on the lookout for him, and requested, if he were found, to arrest and hold him for the county authorities in connection with the murder of the Colemans.

Also on Thursday, April 4th, the county officers, accompanied by two police officers, Stone and Jenkins, of Fredericksburg, went to a house in that city where Jackson was said to reside. He could not be found there, nor at several other places which they visited. At the first place they

found an ax that looked like it possibly had some blood on it, and the ax was turned over to Burgess.

On Saturday, April 6th, a colored man named Johnson, who lived in the first house which had been searched for Jackson, reported to the city police that someone had broken into his house and stolen a shirt and an ax. He was told that Burgess had the ax.

While an intensive search for Jackson was still being pursued, and it had become more or less generally known that the police wanted him, Jackson on Sunday morning, April 7th, came to the office of S. B. Perry, the chief of police of Fredericksburg. The police officer, Stone, was then present in the office. Jackson asked if the police wanted him, and they answered in the affirmative. He then asked for what offense they wanted him. Stone replied, "Housebreaking." But Stone adds and explains in his evidence that that was not the offense for which he actually wanted him. He says he really wanted him for the Spotsylvania county officers in connection with the murder of the Colemans. The officers arrested Jackson, and locked him up. They made the following notation or memoranda of the arrest on their police blotter or record:

"Joe Jackson, age 23, colored, large, single, Officers Stone and Perry, charge. Docket No. 363. Address, Goochland, Virginia. Held for Spotsylvania county authorities."

The city officers immediately called Officer Burgess and notified him that they had Jackson in custody, and were holding him for the county officers.

Both Perry and Stone state that while they knew of Johnson's complaint about housebreaking, they were much more concerned with the more serious charge of murder. There had been no warrant or sworn complaint issued against Jackson for housebreaking. The officers knowing how actively the search for Jackson was being made, and how strongly the county officers desired to secure his detention, disregarded the lesser charge, and held him under the graver charge.

The city and county officers immediately began to question Jackson about the Coleman murders, but he denied his guilt.

On Monday, April 8, 1935, subsequent to the arrest and detention of Jackson, James Hilliard went with his employer, S. J. Clark, to the office of the attorney for the Commonwealth of Spotsylvania county, and there made the following affidavit:

"April 8, 1935.

"I, James Hilliard, colored, age 18.

"I was at Massaponax about 5 o'clock, April 2nd, 1935, I saw Joe Jackson and a bright skin man about 5' 10" or 11" inches tall, weight about 180 or 190 pounds get off of Greyhound Bus. After getting off bus they walked back towards Fredericksburg and then turned across field going towards Edward Samuel's, they got off bus at Mr. Scott's filling station, I was standing at Mr. Shields' filling station.

"James Hilliard."

Later on the same day, Clark took Allen Montague also to the court house to interview the Commonwealth attorney and the sheriff. There Hilliard and Montague amplified the statement made in the Hilliard affidavit. They said they were on the State highway about two miles from the Coleman house, when they saw Jackson and his companion get off the bus. Montague knew neither of the men; but Hilliard recognized Jackson, whom he had formerly known. The field which they saw the two men enter was in the direction of the Coleman home.

Hilliard was employed on the farm of S. J. Clark. Clark's business affairs kept him away from home a great deal of the time, and he had been absent therefrom from April 2nd until Saturday evening, April 6th. On that night when Clark returned, Hilliard told him about seeing Jackson and his companion and about their movements. Although news of the murder had spread all over the county, and was known by these persons, no effort was made on April 6th or 7th to communicate the above knowledge to the police. Clark says he first told the two men of the

offer of a reward when he brought them to the Commonwealth attorney's office.

The sheriff and Officer Burgess, promptly upon receipt of this information from Hilliard and Montague, on the same afternoon, went again to Fredericksburg and there confronted Jackson with it. Jackson continued in his denial of guilt. The officers then drove him around the city in their car, trying to find out where he had bought his clothes and where he had spent his money, but he persisted in his denial.

On Tuesday, April 9th, after persistent questioning, he made a full confession of his guilt in writing, narrating the details of the crime and implicating John Shell as his accomplice. Jackson gave to the officers information which enabled them to locate and arrest Shell in New York. Hilliard and Montague identified both Jackson and Shell as the men they saw getting off the bus on April 2nd.

Jackson and Shell were tried, convicted and executed for the murders.

The three plaintiffs with two other persons filed a joint claim, in writing, before the board of supervisors of the county, for the entire $500 reward. A large number of other persons also filed claims thereto. The several claimants and groups of claimants alleged that they performed various services in connection with the arrest and conviction of the murderers.

There was considerable evidence covering the information and services furnished to the police by the several claimants. All of such services and information may have been useful and helpful in some particular, but it is necessary for us to consider only the value and effect of the information furnished by the plaintiffs. The other claimants are not parties to the proceeding. We are concerned only with the right of the plaintiffs to recover.

The board of supervisors, after hearing evidence in support of the several claims, apportioned the reward in various amounts among eleven persons, allotting to James Hilliard the sum of $95, but allowed nothing to Montague

or Clark, nor to the other two persons who joined in their claim. Neither of the county officers filed any claim, nor was any part of the reward allowed to them.

Hilliard, Montague and Clark appealed to the circuit court from the action of the board. The county did not file an interpleader, nor deposit the money in the court for allotment by it. It denied that the plaintiffs either separately, or jointly, were legally entitled to any of the reward.

The appeal was heard before a court and jury. There were no objections to the instructions given by the court. The jury returned a verdict allowing Hilliard the sum of $95, but allowed nothing to Montague and Clark. The foreman of the jury stated in open court that it was the intention of the jury to approve the allotment as made by the board of supervisors.

The plaintiffs moved the trial court to set aside the verdict as contrary to the law and the evidence. The trial court, in a written opinion, held that there was no conflict in the evidence; that the evidence was insufficient to justify a verdict for the plaintiffs; and that there was no liability against the county. It thereupon set aside the verdict of the jury, and in the order of judgment, dismissed the action at the cost of the plaintiffs.

The plaintiffs in their brief assign two grounds of error; but here rely only on the alleged error of the trial court in refusing to enter final judgment in their favor for the entire amount of the reward.

The principal and material question is whether the plaintiffs substantially complied with the terms of the offer of the reward. Did they, acting in concert, or singly, give the first effective information leading to both the arrest and conviction of the murderers?

As the learned trial judge said, there was no conflict in the testimony. The apportionment by the board of supervisors and the verdict of the jury show that neither considered that the facts disclosed a substantial compliance by the plaintiffs or either of them, with the offer of the

reward. The question then is one of law to be applied to the undisputed facts.

The information given must have been the first effective information leading to the arrest and to the subsequent conviction, in order to support a performance of the contract contained in the offer of reward under review here. That offer, in using the words "and as yet no arrest has been made," made it clear that the information must be furnished prior to the arrest of the person or persons guilty of the crime. It was impossible for any one to fully comply with the terms of the offer of reward after Jackson had been arrested in connection with the murder of the Colemans, and while he was being held in custody therefor. That the information must be received before the arrest is just as necessary and vital as that conviction should follow. It must lead to both arrest and conviction. Information leading to conviction after an arrest is not a compliance with the terms of an offer of reward for information leading to arrest and conviction. *Fitch* v. *Snedaker,* 38 N. Y. 248, 97 Am. Dec. 791; 54 C. J. 793, 794; 23 R. C. L. 1130.

Beyond any question, Jackson was under arrest and held in custody because he was believed to have been connected with the murder of the Colemans, before any one of the plaintiffs had furnished one iota of information to the police relative to his whereabouts or his guilt. The plaintiffs had failed from April 2nd to April 8th, to disclose to the officers the knowledge which two of them had of the presence of Jackson in the vicinity of the crime on April 2nd.

The information upon which the suspicion of the officers was based, came from other sources, and furnished the information which caused them to request the police of Fredericksburg to make the arrest. It was nothing that the plaintiffs, or either of them, did that caused that result. Their undisclosed knowledge and information did not, either directly or indirectly, assist therein. Their information, disclosed after the arrest, furnished a valuable

link in the chain of evidence against the accused, and in all probability assisted in securing a confession of guilt. While thus valuable, its value would have been useless without the arrest. The police of Fredericksburg in apprehending Jackson based their action solely upon the information which they received from Sheriff Blaydes and Burgess. Upon that information they held him to answer the result of an investigation and possibly trial for the murders.

The record contains no evidence that Jackson was guilty of housebreaking. No arrest was made therefor, and the order of his commitment shows no connection therewith. Officer Stone's statement to Jackson that the latter was charged with "housebreaking" was made because of a desire not to disclose the real purpose and intention.

The plaintiffs in furnishing their evidence in this case after the arrest, did only what every good citizen should have a natural urge to do. No payment ought to be made or required for the performance of such an elemental duty of citizenship.

The plaintiffs cite numerous cases from other states arising out of offers of reward. Cases of this character involve offers containing many various terms and conditions of required performance. Decisions therein are dependent both upon the law of the several states and upon the particular facts involved. An examination of those cases discloses that none of them contains exactly the features and facts of the instant case. The general principle followed in those cases, as a rule, is not in conflict with the principle herein approved, that in order for the claimant to recover he must substantially furnish the first effective information leading both to the arrest and conviction of the accused. The mere giving of evidence after an arrest has been made in connection with the offense is not sufficient, although the evidence given is essential to conviction. *County Court of Braxton County* v. *Smith*, 110 W. Va. 392, 158 S. E. 377.

The conclusion which we have reached makes it unnecessary to discuss the principles involving a joint award for

concert of action or the apportionment of a reward where several claimants have separately contributed information. In *Johnson* v. *Perkins,* 166 Va. 654, 186 S. E. 60, these principles are reviewed and discussed.

The trial court very properly held that the evidence did not establish any liability against the county in favor of the plaintiffs. It, therefore, denied any recovery to Hilliard and his fellow-plaintiffs, either jointly or severally. We are in accord with that view, and the judgment of the trial court is affirmed.

*Affirmed.*